OPINION
SMITH, Circuit Judge,
with whom McKEE, Chief Judge, SLOVITER, SCIRICA, RENDELL, AMBRO, FUENTES, FISHER, and VANASKIE, Circuit Judges join.
Once again, we are asked to find the balance between a student’s right to free speech and a school’s need to control its educational environment. In this case, two middle-school students purchased bracelets bearing the slogan “I ¥ boobies! *298 (KEEP A BREAST)” as part of a nationally recognized breast-cancer-awareness campaign. The Easton Area School District banned the bracelets, relying on its authority under Bethel School District No. m v. Fraser, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), to restrict vulgar, lewd, profane, or plainly offensive speech, and its authority under Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), to restrict speech that is reasonably expected to substantially disrupt the school. The District Court held that the ban violated the students’ rights to free speech and issued a preliminary injunction against the ban.
We agree with the District Court that neither Fraser nor Tinker can sustain the bracelet ban. The scope of a school’s authority to restrict lewd, vulgar, profane, or plainly offensive speech under Fraser is a novel question left open by the Supreme Court, and one which we must now resolve. We hold that Fraser, as modified by the Supreme Court’s later reasoning in Morse v. Frederick, 551 U.S. 393, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007), sets up the following framework: (1) plainly lewd speech, which offends for the same reasons obscenity offends, may be categorically restricted regardless of whether it comments on political or social issues, (2) speech that does not rise to the level of plainly lewd but that a reasonable observer could interpret as lewd may be categorically restricted as long as it cannot plausibly be interpreted as commenting on political or social issues, and (3) speech that does not rise to the level of plainly lewd and that could plausibly be interpreted as commenting on political or social issues may not be categorically restricted. Because the bracelets here are not plainly lewd and because they comment on a social issue, they may not be categorically banned under Fraser. The School District has also failed to show that the bracelets threatened to substantially disrupt the school under Tinker. We will therefore affirm the District Court.
I.
A. Factual background
As a “leading youth focused global breast cancer organization,” the Keep A Breast Foundation tries to educate thirteen- to thirty-year-old women about breast cancer. Br. of Amicus Curiae KABF at 13. To that end, it often partners with other merchants to co-brand products that raise awareness. And because it believes that young women’s “negative body image[s]” seriously inhibit their awareness of breast cancer, the Foundation’s products often “seek[ ] to reduce the stigma by speaking to young people in a voice they can relate to.” Id. at 14-15. If young women see such awareness projects and products as cool and trendy, the thinking goes, then they will be more willing to talk about breast cancer openly.
To “start a conversation about that taboo in a light-hearted way” and to break down inhibitions keeping young women from performing self-examinations, the Foundation began its “I ¥ Boobies!” initiative. Id. at 20-21. Part of the campaign included selling silicone bracelets of assorted colors emblazoned with “I ¥ Boobies! (KEEP A BREAST)” and “check y¥urself! (KEEP A BREAST).” Id. at 21-22. The Foundation’s website address (www.keep-a-breast.org) and motto (“art. education, awareness, action.”) appear on the inside of the bracelet. Id.
As intended, the “I ¥ Boobies” initiative was a hit with young women, quickly becoming one of the Foundation’s “most successful and high profile educational campaigns.” Id. at 20-21. Two of the young women drawn to the bracelets were middle-school students B.H. and K.M. They *299 purchased the bracelets with their mothers before the 2010-2011 school year—B.H. because she saw “a lot of [her] friends wearing” the bracelets and wanted to learn about them, and K.M. because of the bracelet’s popularity and awareness message. App. 72, 92,106, 442.
But the bracelets were more than just a new fashion trend. K.M.’s purchase prompted her to become educated about breast cancer in young women. The girls wore their bracelets both to commemorate friends and relatives who had suffered from breast cancer and to promote awareness among their friends. Indeed, their bracelets started conversations about breast cancer and did so far more effectively than the more-traditional pink ribbon. App. 73-74. That made sense to B.H., who observed that “no one really notices” the pink ribbon, whereas the “bracelets are new and ... more appealing to teenagers.” App. 74.
B.H., K.M., and three other students wore the “I V boobies! (KEEP A BREAST)” bracelets at Easton Area Middle School during the 20102011 school year. A few teachers, after observing the students wear the bracelets every day for several weeks, considered whether they should take action. The teachers’ responses varied: One found the bracelets offensive because they trivialized breast cancer. Others feared that the bracelets might lead to offensive comments or invite inappropriate touching. But school administrators also believed that middle-school boys did not need the bracelets as an excuse to make sexual statements or to engage in inappropriate touching. See, e.g., Viglianti Test., App. 196, 198 (testifying that such incidents “happened before the bracelets” and were “going to happen after the bracelets” because “sexual curiosity between boys and girls in the middle school is ... a natural and continuing thing”).
In mid- to late September, four or five teachers asked the eighth-grade assistant principal, Amy Braxmeier, whether they should require students to remove the bracelets. The seventh-grade assistant principal, Anthony Viglianti, told the teachers that they should ask students to remove “wristbands that have the word ‘boobie’ written on them,” App. 343, even though there were no reports that the bracelets had caused any in-school disruptions or inappropriate comments.[1]
With Breast Cancer Awareness Month approaching in October, school administrators anticipated that the “I V boobies! (KEEP A BREAST)” bracelets might reappear.[2] The school was scheduled to observe Breast Cancer Awareness Month on October 28, so the day before, administrators publicly announced, for the first time, the ban on bracelets containing the word “boobies.” Using the word “boobies” in his announcement, Viglianti notified students of the ban over the public-address system, and a student did the same on the school’s television station. The Middle School still encouraged students to wear the traditional pink, and it provided teachers who donated to Susan G. Komen for the Cure with either a pin bearing the slogan “Passionately Pink for the Cure” or a T-shirt reading “Real Rovers Wear Pink.”
*300 Later that day, a school security guard noticed B.H. wearing an “I V boobies! (KEEP A BREAST)” bracelet and ordered her to remove it. B.H. refused. After meeting with Braxmeier, B.H. relented, removed her bracelet, and returned to lunch. No disruption occurred at any time that day.
The following day, B.H. and K.M. each wore their “I V boobies! (KEEP A BREAST)” bracelets to observe the Middle School’s Breast Cancer Awareness Day. The day was uneventful—until lunchtime. Once in the cafeteria, both girls were instructed by a school security guard to remove their bracelets. Both girls refused. Hearing this encounter, another girl, R.T., stood up and similarly refused to take off her bracelet. Confronted by this act of solidarity, the security guard permitted the girls to finish eating then-lunches before escorting them to Braxmeier’s office. Again, the girls’ actions caused no disruption in the cafeteria, though R.T. told Braxmeier that one boy had immaturely commented either that he also “love[d] boobies” or that he “love[d] her boobies.”
Braxmeier spoke to all three girls, and R.T. agreed to remove her bracelet. B.H. and K.M. stood firm, however, citing their rights to freedom of speech. The Middle School administrators were having none of it. They punished B.H. and K.M. by giving each of them one and a half days of in-school suspension and by forbidding them from attending the Winter Ball. The administrators notified the girls’ families, explaining only that B.H. and K.M. were being disciplined for “disrespect,” “defiance,” and “disruption.”
News of the bracelets quickly reached the rest of the Easton Area School District, which instituted a district-wide ban on the “I V boobies! (KEEP A BREAST)” bracelets, effective on November 9, 2010. The only bracelet-related incident reported by school administrators occurred weeks after the district-wide ban: Two girls were talking about their bracelets at lunch when a boy who overheard them interrupted and said something like “I want boobies.” He also made an inappropriate gesture with two red spherical candies. The boy admitted his “rude” comment and was suspended for one day.[3]
This was not the first time the Middle School had banned clothing that it found distasteful. Indeed, the School District’s dress-code policy prohibits “clothing imprinted with nudity, vulgarity, obscenity, profanity, and double entendre pictures or slogans.”[4] Under the policy, seventh-grade students at the Middle School have been asked to remove clothing promoting Hooters and Big Pecker’s Bar & Grill, as well as clothing bearing the phrase “Save the ta-tas” (another breast-cancer-awareness slogan). Typically, students are disciplined only if they actually refuse to remove the offending apparel when asked to do so.
B. Procedural history
Through their mothers, B.H. and K.M. sued the School District under 42 U.S.C. § 1983.[5] Compl., ECF No. 1 ¶ 3, B.H. v. *301 Easton Area Sch. Dist., No. 5:10-CV-06283-MAM (E.D.Pa. Nov. 15, 2010). They sought a temporary restraining order allowing them to attend the Winter Ball and a preliminary injunction against the bracelet ban. B.H. v. Easton Area Sch. Dist., 827 F.Supp.2d 392, 394 (E.DJPa. 2011). At the District Court’s urging, the School District reversed course and permitted B.H. and K.M. to attend the Winter Ball while retaining the option to impose a comparable punishment if the bracelet ban was upheld. Id. The District Court accordingly denied the motion for a temporary restraining order. Id.
The District Court conducted an evidentiary hearing on the request for a preliminary injunction. It soon became clear that the School District’s rationale for disciplining B.H. and K.M. had shifted. Although B.H.’s and K.M.’s disciplinary letters indicated only that they were being disciplined for “disrespect,” “defiance,” and “disruption,” the School District ultimately based the ban on its dress-code policy[6] together with the bracelets’ alleged sexual innuendo. According to the School District’s witnesses, the Middle School assistant principals had conferred and concluded that the bracelets “conveyed a sexual double entendre” that could be harmful and confusing to students of different physical and sexual developmental levels. Sch. Disk's Br. at 9. And the principals believed that middle-school students, who often have immature views of sex, were particularly likely to interpret the bracelets that way. For its part, the Foundation explained that no one there “ever suggested that the phrase T (Heart) Boobies!’ is meant to be sexy.” App. 150. To that end, the Foundation had denied requests from truck stops, convenience stores, vending machine companies, and pornographers to sell the bracelets.
After the evidentiary hearing, the District Court preliminarily enjoined the School District’s bracelet ban. According to the District Court, B.H. and K.M. were likely to succeed on the merits because the bracelets did not contain lewd speech under Fraser and did not threaten to substantially disrupt the school environment under Tinker. The District Court could find no other basis for regulating the student speech at issue. The School District appealed, and the District Court denied its request to stay the injunction pending this appeal.
II.
Although the District Court’s preliminary injunction is not a final order, we have jurisdiction under 28 U.S.C. § 1292(a)(1), which grants appellate jurisdiction over “[ijnterlocutory orders of the district courts ... granting, continuing, modifying, refusing, or dissolving injunctions.” See Sypniewski v. Warren Hills Reg’l Bd. of Educ., 307 F.3d 243, 252 n. 10 (3d Cir.2002). We review the District Court’s factual findings for clear error, its legal conclusions de novo, and its ultimate decision to grant the preliminary injunc *302 tion for abuse of discretion. Id. at 252. Four factors determine whether a preliminary injunction is appropriate:
(1) whether the movant has a reasonable probability of success on the merits;
(2) whether the movant will be irreparably harmed by denying the injunction;
(3) whether there will be greater harm to the nonmoving party if the injunction is granted; and (4) whether granting the injunction is in the public interest.
Id. (quoting Highmark, Inc. v. UPMC Health Plan, Inc, 276 F.3d 160, 170 (3d Cir.2001)). The District Court concluded that all four factors weighed in favor of B.H. and K.M. In school-speech cases, though, the first factor—-the likelihood of success on the merits—tends to determine which way the other factors fall. Id. at 258. Because the same is true here, we focus first on B.H. and KM.’s burden to show a likelihood of success on the merits. Id.
III.
The School District defends the bracelet ban as an exercise of its authority to restrict lewd, vulgar, profane, or plainly offensive student speech under Fraser. As to the novel question of Fraser’s scope, jurists seem to agree on one thing: “[t]he mode of analysis employed in Fraser is not entirely clear.” Morse, 551 U.S. at 404, 127 S.Ct. 2618.[7] On this point, we think the Supreme Court’s student-speech cases are more consistent than they may first appear. As we explain, Fraser involved only plainly lewd speech. We hold that, under Fraser, a school may also categorically restrict speech that—although not plainly lewd, vulgar, or profane—could be interpreted by a reasonable observer as lewd, vulgar, or profane so long as it could not also plausibly be interpreted as commenting on a political or social issue. Because the “I V boobies! (KEEP A BREAST)” bracelets are not plainly lewd and express support for a national breast-cancer-awareness campaign-—unquestionably an important social issue—they may not be categorically restricted under Fraser.

A. The Supreme Court’s decision in Fraser

“[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.” Ashcroft v. ACLU, 535 U.S. 564, 573, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002). Of course, there are exceptions. When acting as sovereign, the government is empowered to impose time, place, and manner restrictions on speech, see Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), make reasonable, content-based decisions about what speech is allowed on government property that is not fully open to the public, see Ark. Educ. Television Comm’n v. Forbes, 523 U.S. 666, 674-75, *303 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998), decide what viewpoints to espouse in its own speech or speech that might be attributed to it, see Johanns v. Livestock Mktg. Ass’n, 544 U.S. 550, 560, 125 S.Ct. 2055, 161 L.Ed.2d 896 (2005), and categorically restrict unprotected speech, such as obscenity, see Miller v. California, 413 U.S. 15, 23, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).[8]
Sometimes, however, the government acts in capacities that go beyond being sovereign. In those capacities, it not only retains its sovereign authority over speech but also gains additional flexibility to regulate speech. See In re Kendall, 712 F.3d 814, 825 (3d Cir.2013) (collecting examples). One of those other capacities is K-12 educator. Although “students do not ‘shed their constitutional rights to freedom of speech or expression at the schoolhouse gate,’ ” the First Amendment has to be “applied in light of the special characteristics of the school environment” and thus students’ rights to freedom of speech “are not automatically coextensive with the rights of adults in other settings.” Morse, 551 U.S. at 396-97,127 S.Ct. 2618 (internal quotation marks and citations omitted).
The Supreme Court first expressed this principle nearly a half century ago. In 1965, the United States deployed over 200,000 troops to Vietnam as part of Operation Rolling Thunder—and thus began the Vietnam War. That war “divided this country as few other issues [e]ver have.” Tinker, 393 U.S. at 524, 89 S.Ct. 733 (Black, J., dissenting). Public opposition to the war made its way into schools, and in one high-profile case, a group of high-school and middle-school students wore black armbands to express their opposition. Id. at 504, 89 S.Ct. 733 (majority opinion). School officials adopted a policy prohibiting the armbands and suspending any student who refused to remove it when asked. Id. Some students refused and were suspended. Id. The Supreme Court upheld their right to wear the armbands. Id. at 514, 89 S.Ct. 733. Tinker held that school officials may not restrict student speech without a reasonable forecast that the speech would substantially disrupt the school environment or invade the rights of others. Id. at 513, 89 S.Ct. 733. As nothing more than the “silent, passive expression of opinion, unaccompanied by any disorder or disturbance on [the students’] part,” the students’ armbands were protected by the First Amendment. Id. at 508, 89 S.Ct. 733.
Under Tinkers “general rule,” the government may restrict school speech that threatens a specific and substantial disruption to the school environment or that “inva[des] ... the rights of others.”[9] *304 Saxe v. State College Area Sch. Dist., 240 F.3d 200, 211, 214 (3d Cir.2001) (citing Tinker, 393 U.S. at 504, 89 S.Ct. 733). Since Tinker, the Supreme Court has identified three “narrow” circumstances in which the government may restrict student speech even when there is no risk of substantial disruption or invasion of others’ rights. Id. at 212. First, the government may categorically restrict vulgar, lewd, profane, or plainly offensive speech in schools, even if it would not be obscene outside of school. Fraser, 478 U.S. at 683, 685, 106 S.Ct. 3159. Second, the government may likewise restrict speech that “a reasonable observer would interpret as advocating illegal drug use” and that cannot “plausibly be interpreted as commenting on any political or social issue.” Morse, 551 U.S. at 422, 127 S.Ct. 2618 (Alito, J., concurring); see also id. at 403, 127 S.Ct. 2618 (majority opinion) (“[TJhis is plainly not a case about political debate over the criminalization of drug use or possession.”).[10] And third, the government may impose restrictions on school-sponsored speech that are “reasonably related to legitimate pedagogical concerns”—a power usually lumped together with the other school-specific speech doctrines but that, strictly speaking, simply reflects the government’s more general power as sovereign over government-sponsored speech.[11] Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 273, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988).
The first exception is at issue here. We must determine the scope of the government’s authority to categorically restrict vulgar, lewd, indecent, or plainly offensive speech under Fraser. Fraser involved a high-school assembly during which a student “nominated a peer for class office through an ‘an elaborate, graphic, and explicit sexual metaphor.’ ” Saxe, 240 F.3d at 212 (quoting Fraser, 478 U.S. at 677, 106 S.Ct. 3159). Fraser’s speech “glorifiied] male sexuality”:
I know a man who is firm—he’s firm in his pants, he’s firm in his shirt, his character is firm—but most ... of all, his belief in you, the students of Bethel, is firm.... Jeff Kuhlman [the candidate] is a man who takes his point and pounds it in. If necessary, he’ll take an issue and nail it to the wall. He doesn’t attack things in spurts, he drives hard, *305 pushing and pushing until finally—he succeeds.... Jeff is a man who will go to the very end—even the climax, for each and every one of you.... So vote for Jeff for A.S.B. vice-president—he’ll never come between you and the best our high school can be.
Fraser, 478 U.S. at 687, 106 S.Ct. 3159 (Brennan, J., concurring). In response, “[s]ome students hooted and yelled; some by gestures simulated the sexual activities pointedly alluded to in [Fraser’s] speech.” Id. at 678, 106 S.Ct. 3159 (majority opinion). Still “[o]ther students appeared to be bewildered and embarrassed by the speech.” Id. The school suspended Fraser and took him out of the running for graduation speaker. Id.
The Supreme Court upheld Fraser’s suspension. Id. at 683, 106 S.Ct. 3159. Rather than requiring a reasonable forecast of substantial disruption under Tinker, the Court held that lewd, vulgar, indecent, and plainly offensive student speech is categorically unprotected in school, even if it falls short of obscenity and would have been protected outside school. Saxe, 240 F.3d at 213 (discussing Fraser)-, Morse, 551 U.S. at 405, 127 S.Ct. 2618 (“Had Fraser delivered the same speech in a public forum outside the school context, it would have been protected.”); Fraser, 478 U.S. at 688, 106 S.Ct. 3159 (Blackmun, J., concurring) (“If [Fraser] had given the same speech outside of the school environment, he could not have been penalized simply because government officials considered his language to be inappropriate.”). For this proposition, the Court relied on precedent holding that the government can restrict expression that would be obscene from a minor’s perspective-even though it would not be obscene in an adult’s view—where minors are either a captive audience or the intended recipients of the speech. See Fraser, 478 U.S. at 684-85, 106 S.Ct. 3159 (relying on Ginsberg v. New York, 390 U.S. 629, 635-37 & nn. 45, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) (upholding criminal punishment for selling to minors any picture depicting nudity); Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico, 457 U.S. 853, 870, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) (plurality opinion) (acknowledging that the Free Speech Clause would allow a local board of education to remove “pervasively vulgar” books from school libraries); and FCC v. Pacifica Found., 438 U.S. 726, 749-50, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) (rejecting a Free Speech Clause challenge to the FCC’s broad leeway to regulate indecent-but-not-obscene material on broadcast television during hours when children were likely to watch)).
Fraser did no more than extend these obscenity-to-minors[12] cases to another place where minors are a captive audience—schools. Indeed, as the Court explained, schools are tasked with more than *306 just “educating our youth” about “books, the curriculum, and the civics class.” Id. at 681, 106 S.Ct. 3159. Society also expects schools to “teaeh[ ] students the boundaries of socially appropriate behavior,” including the “fundamental values of ‘habits and manners of civility’ essential to a democratic society.” Id. at 681, 683, 106 S.Ct. 3159 (citation omitted). Consequently, Fraser’s “sexually explicit monologue” was not protected. Id. at 685, 106 S.Ct. 3159.
It is important to recognize what was not at stake in Fraser. Fraser addressed only a school’s power over speech that was plainly lewd—not speech that a reasonable observer could interpret as either lewd or non-lewd. See, e.g., Doninger v. Niehoff, 527 F.3d 41, 49 (2d Cir.2008) (“[Fraser’s ] reference to ‘plainly offensive’ speech must be understood in light of the vulgar, lewd, and sexually explicit language that was at issue in [that] case.”); Chandler v. McMinnville Sch. Dist., 978 F.2d 524, 530 (9th Cir.1992) (interpreting Fraser as limited to “per se vulgar, lewd, obscene, or plainly offensive” school speech). After all, the Court believed Fraser’s speech to be “plainly offensive to both teachers and students—indeed to any mature person.” [13] Fraser, 478 U.S. at 683, 106 S.Ct. 3159.
And because it was plainly lewd, the Court did not believe that Fraser’s speech could plausibly be interpreted as political or social commentary. In hindsight, it might be tempting to believe that Fraser’s speech was political because it was made in the context of a student election. Cf. Citizens United v. FEC, 558 U.S. 310, 130 S.Ct. 876, 898, 175 L.Ed.2d 753 (2010) (describing the importance of political speech as the “means to hold officials accountable to the people”). But that kind of revisionist history is belied by both the logic and language of Fraser. “Fraser permits a school to prohibit words that ‘offend for the same reasons that obscenity offends.’ ” Saxe, 240 F.3d at 213 (quoting Fraser, 478 U.S. at 685, 106 S.Ct. 3159). Obscenity, in turn, offends because it is “no essential part of any exposition of ideas, and [is] of such slight social value as a step to truth that any benefit that may be derived from [it] is clearly outweighed by the social interest in order and morality.” Fraser, 478 U.S. at 683, 106 S.Ct. 3159 (quoting Pacifica Found., 438 U.S. at 746, 98 S.Ct. 3026 (plurality opinion)). In other words, obscenity and obscenity to minors, like “other historically unprotected categories of speech,” have little or no political or social value. United States v. Stevens, 559 U.S. 460, 130 S.Ct. 1577, 1585, 176 L.Ed.2d 435 (2010). By concluding that Fraser’s speech met the obscenity-to-minors standard, the Court necessarily implied that his speech could not be interpreted as having “serious” political value. Miller, 413 U.S. at 24, 93 S.Ct. 2607.
In fact, the majority in Fraser made this explicit. “[T]he Fraser [C]ourt distinguished its holding from Tinker in part on the absence of any political message in Fraser’s speech.” Guiles ex rel. Guiles v. Marinean, 461 F.3d 320, 326, 328 (2d Cir.2006). In the Court’s own words, there *307 was a “marked distinction between the political ‘message’ of the armbands in Tinker and the sexual content of [Fraser’s] speech.” Fraser, 478 U.S. at 680, 106 S.Ct. 3159 (emphasis added); see also Defoe ex rel. Defoe v. Spiva, 625 F.3d 324, 332 (6th Cir.2010) {“Tinker governs this case because by wearing clothing bearing images of the Confederate flag, Tom Defoe engaged in ‘pure speech,’ which is protected by the First Amendment, and thus Fraser would not apply.”). Several courts of appeals have similarly interpreted Fraser. Guiles, 461 F.3d at 326, 328; Newsom ex rel. Newsom v. Albemarle Cnty. Sch. BcL, 354 F.3d 249, 256 (4th Cir.2003) (explaining that Fraser “distinguished] Tinker on the basis that the lewd, vulgar, and plainly offensive speech was ‘unrelated to any political viewpoint’ ” (quoting Fraser, 478 U.S. at 685, 106 S.Ct. 3159)); Chandler, 978 F.2d at 532 n. 2 (Goodwin, J., concurring) (concluding that Fraser does not apply because “this case clearly involves political speech”). And the Supreme Court later characterized Fraser's reasoning the same way. Morse, 551 U.S. at 404, 127 S.Ct. 2618 (noting that Fraser was “plainly attuned” to the sexual, nonpolitical “content of Fraser’s speech”). In fact, Morse refused to “stretch[ ] Fraser ” so far as to “encompass any speech that could fit under some definition of ‘offensive’” out of a fear that “much political and religious speech might be perceived as offensive to some.” Id. at 409, 127 S.Ct. 2618. Fraser therefore involved plainly lewd speech that did not comment on political or social issues.
B. How far does a school’s authority under Fraser extend?
The School District asks us to extend Fraser in at least two ways: to reach speech that is ambiguously lewd, vulgar, or profane and to reach speech on political or social issues.[14] The first step is justified, but the second is not.
*308 1. Under Fraser, schools may restrict ambiguously lewd speech only if it cannot plausibly be interpreted as commenting on a social or political matter.
Although Fraser involved plainly lewd, vulgar, profane, or offensive speech that “offends for the same reasons obscenity offends,” Saxe, 240 F.3d at 213 (quoting Fraser, 478 U.S. at 685, 106 S.Ct. 3159), student speech need not rise to that level to be restricted under Fraser. We conclude that schools may also categorically restrict ambiguous speech that a reasonable observer could interpret as lewd, vulgar, profane, or offensive—unless, as explained below, the speech could also plausibly be interpreted as commenting on a political or social issue. After all, Fraser made clear that “the determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board.” 478 U.S. at 683, 106 S.Ct. 3159. The Supreme Court’s three other student-speech cases suggest that courts should defer to a school’s decisions to restrict what a reasonable observer would interpret as lewd, vulgar, profane, or offensive. See Morse, 551 U.S. at 403, 127 S.Ct. 2618 (explaining that, under Tinker, courts determine whether school officials have “reasonably concluded]” that student speech will substantially disrupt the school); id. at 405, 127 S.Ct. 2618 (explaining that, under Kuhlmeier, courts uphold a school’s reasonable, pedagogically related restrictions on speech that an observer could reasonably attribute to the school); id. at 422, 127 S.Ct. 2618 (Alito, J., concurring) (explaining that schools may restrict student speech that could “reasonably be regarded as encouraging illegal drug use” and that could not plausibly be interpreted as commenting on a political or social issue). This makes sense. School officials know the age, maturity, and other characteristics of their students far better than judges do. Our review is restricted to a cold and distant record. And we must take into account that these same officials must often act “suddenly and unexpectedly” based on their experience. Id. at 409-10, 127 S.Ct. 2618 (majority opinion); see, e.g., Walker-Serrano ex rel. Walker v. Leonard, 325 F.3d 412, 416-17 (3d Cir. 2003) (“There can be little doubt that speech appropriate for eighteen-year-old high school students is not necessarily acceptable for seven-year-old grammar school students. Human sexuality provides the most obvious example of age-sensitive matter....” (citing Fraser, 478 U.S. at 683-84, 106 S.Ct. 3159)); Sypniewski, 307 F.3d at 266 (“What is necessary in one school at one time will not be necessary elsewhere and at other times.”).
It remains the job of judges, nonetheless, to determine whether a reasonable observer could interpret student speech as lewd, profane, vulgar, or offensive. See Morse, 551 U.S. at 402, 127 S.Ct. 2618 (taking the same approach with respect to the message of drug advocacy on Frederick’s banner); see also Christian Legal Soc’y Chapter of the Univ. of Cal. v. Martinez, — U.S.-, 130 S.Ct. 2971, 2988, 177 L.Ed.2d 838 (2010) (“This Court is the final arbiter of the question whether a public university has exceeded constitutional constraints, and we owe no defer *309 ence to universities when we consider that question.”). Whether a reasonable observer could interpret student speech as lewd, profane, vulgar, or offensive depends on the plausibility of the school’s interpretation in light of competing meanings; the context, content, and form of the speech; and the age and maturity of the students. See, e.g., Chandler, 978 F.2d at 530 (analyzing the word “scab” on buttons worn by students during a teacher strike to determine whether it was a vulgar, offensive epithet or just “common parlance” and concluding that, at the motion-to-dismiss stage, Fraser did not apply).
Although this is a highly contextual inquiry, several rules apply. A reasonable observer would not adopt an aeon-textual interpretation, and the subjective intent of the speaker is irrelevant. See Morse, 551 U.S. at 401-02, 127 S.Ct. 2618 (explaining that Frederick’s desire to appear on television “was a description of [his] motive for displaying the banner” and “not an interpretation of what the banner sa[id]”); see also Saxe, 240 F.3d at 216-17 (noting that students’ intent to offend or disrupt does not satisfy Tinker). And Fraser is not a blank check to categorically restrict any speech that touches on sex or any speech that has the potential to offend. See Morse, 551 U.S. at 401, 409, 127 S.Ct. 2618 (refusing to “stretch[] Fraser” so far as “to encompass any speech that could fit under some definition of ‘offensive’ and rejecting the argument that the “BONG HiTS 4 JESUS” message on Frederick’s banner could be banned under Fraser, even though it “is no doubt offensive to some” ”); accord Eugene Volokh, May ‘Jesus Is Not a Homophobe’ T-shirt Be Banned From Public High School As Indecent’ And ‘Sexual’?, The Volokh Conspiracy (Apr. 4, 2012, 3:36 PM), http:// www.volokh.com/2012/04/04/may-jesuswas-not-a-homophobe-T-shirt-be-bannedfrom-public-high-school-as-indecent-and-sexual/ (“But Fraser ... hardly suggested that all speech on political and religious questions related to sexuality and sexual orientation could be banned from public high school.”). After all, a school’s mission to mold students into citizens capable of engaging in civil discourse includes teaching students of sufficient age and maturity how to navigate debates touching on sex.
2. Fraser does not permit a school to restrict ambiguously lewd speech that can also plausibly be interpreted as commenting on a social or political issue.
A school’s leeway to categorically restrict ambiguously lewd speech, however, ends when that speech could also plausibly be interpreted as expressing a view on a political or social issue. Justices Alito and Kennedy’s concurrence in Morse adopted a similar protection for political speech that could be interpreted as illegal drug advocacy. Their narrower rationale protecting political speech limits and controls the majority opinion in Morse, and it applies with even greater force to ambiguously lewd speech.
Justice Alito’s concurrence, joined by Justice Kennedy, provided the crucial fourth and fifth votes in the five-to-four majority opinion. But the two justices conditioned their votes on the “understanding that (1) [the majority opinion] goes no further than to hold that a public school may restrict speech that a reasonable observer would interpret as advocating illegal drug use and (2) it provides no support for any restriction of speech that can plausibly be interpreted as commenting on any political or social issue.” Morse, 551 U.S. at 422, 127 S.Ct. 2618 (Alito, J., concurring); see id. at 425, 127 *310 S.Ct. 2618 (regarding the categorical regulation of non-political advocacy of ambiguous illegal drug advocacy “as standing at the far reaches of what the First Amendment permits” and “join[ing] the opinion of the Court with the understanding that the opinion does not endorse any further extension”). The purpose of Justice Alito’s concurrence was to “ensur[e] that political speech will remain protected within the school setting” (subject, as always, to Tinkers substantial-disruption principle). Ponce v. Socorro Indep. Sch. Dist., 508 F.3d 765, 768 (5th Cir.2007).
Because the votes of Justices Alito and Kennedy were necessary to the majority opinion and were expressly conditioned on their narrower understanding that speech plausibly interpreted as political or social commentary was protected from categorical regulation, that limitation is a binding part of Morse. This conclusion requires a minor detour. The most familiar situation in which we follow the narrowest rationale was expressed t by the Supreme Court in Marks v. United States: when “no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.” 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (internal quotation marks and citations omitted). But that situation is not the only one in which we tally the justices’ views and look for the narrowest rationale. The Supreme Court and this Court have both applied the narrowest-grounds approach in circumstances beyond those posed by Marks, including to determine holdings in majority opinions (not just plurality opinions involving “no single legal rationale explaining] the result”) [15] and to count even dissenting justices’ votes that, by definition, could not “explain the result” (not just the votes of those who “concurred in the judgments”).[16] See United States v. Johnson, 467 F.3d 56, 65 (1st Cir.2006) (noting that the Supreme Court has “moved away” from adhering to the strict circumstances in Marks).
And it makes sense that the limitations in Justice Alito’s concurrence would narrow the majority opinion. When an individual justice’s vote is not needed to form a majority, “the meaning of a majority opinion is to be found within the opinion itself’ because “the gloss that an individual [j]ustice chooses to place upon it is not authoritative.” McKoy v. North Carolina, 494 U.S. 433, 448 n. 3, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) (Blackmun, J., concurring). But when an individual justice joins the majority and is essential to maintaining the majority, and then writes separately, “the opinion is not a majority opinion except to the extent that it accords with his views.” Id. at 462 n. 3, 110 S.Ct. 1227 (Scalia, J., dissenting). Of course, that linchpin justice’s opinion “cannot add to what the majority opinion holds” by “binding the other four ¡^justices to what they have not said” because his views would not be the narrowest grounds. Id. But that justice’s separate opinion “can assuredly narrow what the majority opinion holds, by explaining the more limited interpretation *311 adopted by that necessary member of the majority.” Id. In that case, the linchpin justice’s views are “the least common denominator” necessary to maintain a majority opinion. Id.; see generally Sonja R. West, Concurring in Part and Concurring in the Confusion, 104 Mich. L.Rev.1951 (2006) (advocating the same approach and explaining that it is consistent with determining precedent from the traditional Supreme Court’s seriatim opinions).
Indeed, this is not the first time that we have been compelled to limit a majority opinion by a linchpin justice’s narrower concurrence. In Horn v. Thoratec, we considered whether the federal regulation of medical devices preempts only state-law “requirement^]” specific to medical devices or also preempts general common-law claims not specific to medical devices (such as negligence). See 376 F.3d 163, 173-74 (3d Cir.2004). That, in turn, required us to analyze the Supreme Court’s decision in Medtronic v. Lohr, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). We read Part V of the Lohr majority opinion—which Justice Breyer formally joined as the fifth vote—as saying that only device-specific state-law requirements, not general common-law claims, are preempted. See Horn, 376 F.3d at 174 (noting that the majority in Part V conclud[ed] that common-law claims “escape! ]” preemption because “their generality leaves them outside” of the preempted category of device-specific requirements (quoting Lohr, 518 U.S. at 502, 116 S.Ct. 2240)); id. at 175 (explaining that “Justice Breyer joined in some parts of Justice Stevens’ plurality opinion (thus making it a majority opinion at times),” including “in Part V”). But we also read Justice Breyer’s concurrence as reaching the opposite conclusion, despite his having joined that portion of the majority opinion. See id. Faced with an apparent conflict between Part V of the majority opinion and Justice Breyer’s concurrence, we followed the latter because it was narrower, just as the Fifth, Sixth, Seventh, Eighth, and Ninth Circuits had done. Id. at 175-76; see also Martin v. Medtronic, 254 F.3d 573, 581-83 (5th Cir.2001); Kemp v. Medtronic, 231 F.3d 216, 230 (6th Cir.2000); Mitchell v. Collagen Corp., 126 F.3d 902, 911-12 (7th Cir.1997); Papike v. Tambrands, Inc., 107 F.3d 737, 742 (9th Cir.1997). In doing so, we rejected our dissenting colleague’s argument that the narrowest-grounds approach was “simply inapplicable” because Justice Breyer joined Part V of the majority opinion and that the “correct course of action” in the event of a conflict “would be to follow Part V as the majority opinion.” Horn, 376 F.3d at 184 & n. 30 (Fuentes, J., dissenting); see id. at 183 (explaining that the Horn majority and the Seventh and Ninth Circuits “also perceived a contradiction and chose to ignore Justice Breyer’s vote for Part V, instead crediting the apparently contrary reasoning in his concurrence”).
Likewise, in United States v. Bishop, 66 F.3d 569, 576-77 (3d Cir.1995), we relied on the narrower concurring views of Justices Kennedy and O’Connor to limit the majority’s opinion in United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), which they formally joined as the fourth and fifth votes. We declined to read the majority opinion so broadly as to upend judicial deference to Congress’s judgment about whether an activity substantially implicates interstate commerce, instead following the concurrence’s view that the majority had reached a “necessary though limited holding” that still “counseled great restraint” before finding that Congress had transgressed its Commerce Clause power. Bishop, 66 F.3d at 590 (quoting Lopez, 514 U.S. at 568, 115 S.Ct. 1624 (Kennedy, J., concurring)). As *312 in Horn, we took that approach notwithstanding our dissenting colleague’s argument that we should follow the breadth of the majority opinion and ignore the narrower concurrence because “Justices O’Connor and Kennedy joined in the [majority] opinion.” Id. at 591 (Becker, J., concurring in part and dissenting in part). As even our dissenting colleague explained, we followed the narrower views of Justices O’Connor and Kennedy because they “form[ed] an intermediate bloc [of the majority] which would view Lopez as case-specific.” Id. And Horn and Bishop are not the only examples. See, e.g., United States v. Monclavo-Cruz, 662 F.2d 1285, 1288 (9th Cir.1981) (relying on the narrowing construction given to the majority opinion by Justice Powell, who was also a necessary member of the majority, to limit the majority’s holding in South Dakota v. Opperman, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976)); United States v. Wilson, 636 F.2d 1161, 1164 (8th Cir.1980) (similar).
To be sure, the Supreme Court once said—in a case not involving a linchpin concurrence—that federal courts should not give “much precedential weight” to a concurring opinion, even if it coheres with the majority opinion. Alexander v. Sandoval, 532 U.S. 275, 285 n. 5, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001); see also Vasquez v. Hillery, 474 U.S. 254, 106 S.Ct. 617, 622 n. 4, 88 L.Ed.2d 598 (1986) (describing the Marks rule as “inapplicable” to an opinion “to which five Justices expressly subscribed”). Yet we have already decided that this principle from Alexander is inapplicable to a concurrence that (1) “cast the so-called ‘swing vote,’ which was crucial to the outcome of the case and without which there could be no majority,” and (2) took a narrower approach than the majority opinion. Horn, 376 F.3d at 174-75 (distinguishing Alexander on this basis).
Which brings us back to Justice Alito’s concurrence in Morse. The linchpin justices in Morse—Justices Alito and Kennedy—expressly conditioned their joining the majority opinion on a narrower interpretation of the opinion—namely, that it did not permit the restriction of speech that could plausibly be interpreted as political or social speech. Had they known that lower courts would ignore their narrower understanding of the majority opinion—or had the majority opinion expressly gone farther than their limitations—then, by their own admission, they would not have joined the majority opinion. That would have transformed the five-justice majority opinion into a three-justice plurality opinion, with their concurring views becoming the controlling narrowest grounds under an uncontroversial application of the Marks doctrine. Why, then, should it matter whether they formally joined the majority opinion or not?
It should not. Ignoring limitations placed on the majority opinion by a necessary member of the majority would mean that four justices could “fabricate a majority by binding a fifth to their interpretation of what they say, even though he writes separately to explain his own more narrow understanding.” McKoy, 494 U.S. at 462 n. 3, 110 S.Ct. 1227 (Scalia, J., dissenting). That produces inexplicable anomalies. If a four-justice plurality holds X and Y, and a fifth justice “concurs in the judgment” to hold only X and rejects Y, the fifth member’s more limited views become binding under a straightforward application of Marks. The same interpretation is true if the fifth justice joins the majority opinion and “concurs in part.” Yet if the same concurring justice joins the majority opinion while “concurring,” then the majority opinion holding X and Y becomes binding *313 and the fifth member’s narrower views evaporate. Such an approach places all of its weight on the distinction between a justice’s choice to follow his name with “concurring” instead of “concurring in part” or “concurring in the judgment.” Cf. West, Concurring in Part and Concurring in the Confusion, 104 Mich. L.Rev. at 1953-54 (explaining why these “after the comma” phrases cannot bear such weight); Tristan C. Pelham-Webb, Note, Powelling for Precedent: “Binding ” Concurrences, 64 N.Y.U. Ann. Surv. Am. L. 693, 737 (2009) (same). That elevates formalism over substance at the expense of ignoring the very conditions on which a necessary member of the majority expressly chose to join the majority.
In short, because Justice Alito’s concurrence provides “a single legal standard ... [that] when properly applied, produce[s] results with which a majority of the Justices in the case articulating the standard would agree,” United States v. Donovan, 661 F.3d 174, 182 (3d Cir.2011) (alterations in original) (internal quotation marks and citations omitted), his opinion in Morse forms the “narrowest grounds necessary to secure a majority,” Planned Parenthood of Se. Pa. v. Casey, 947 F.2d 682, 694 n. 7 (3d Cir.1991), aff'd in part and rev’d in part on other grounds, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). As a result, we agree with the en banc Fifth Circuit that the limitations placed on the majority opinion by Justice Alito’s concurrence are binding on us.[17] See Morgan v. Swanson, 659 F.3d 359, 403 (5th Cir.2011) (en banc) (majority opinion of Elrod, J.) (describing Justice Alito’s Morse concurrence as “controlling”); see also Morgan v. Plano Indep. Sch. Dist., 589 F.3d 740, 746 n. 25 (5th Cir.2009) (“We have held Justice Alito’s concurrence to be the controlling opinion in Morse.” (citing Ponce, 508 F.3d at 768)).
Justice Alito would have protected political or social speech reasonably interpreted to advocate illegal drug use, and that protection applies even more strongly to ambiguously lewd speech. In Morse, the Court added a new categorical exception to Tinker, student speech that a reasonable observer could interpret as advocating illegal drug use but that cannot plausibly be interpreted as addressing political or social issues. Id. at 422, 127 S.Ct. 2618. The exception was justified because illegal drugs pose an “immediately obvious,” “grave” and “unique threat to the physical safety of students.” Id. at 425, 127 S.Ct. 2618. Despite that threat, however, the Court held that speech advocating illegal drug use is not categorically unprotected if it “can plausibly be interpreted as commenting on any political or social issue, including speech on issues such as the wisdom of the war on drugs or of legalizing marijuana for medicinal use.” Id. at 422, 127 S.Ct. 2618 (internal quotation marks omitted). Even with that limitation, the Court made clear that this new *314 exception to Tinker “stances] at the far reaches of what the First Amendment permits.” Id. at 425,127 S.Ct. 2618.
If speech posing such a “grave” and “unique threat to the physical safety of students” can be categorically regulated only when it cannot “plausibly be interpreted as commenting on any political or social issue”—and that regulation nonetheless “stand[s] at the far reaches of what the First Amendment permits”—then there is no reason why ambiguously lewd speech should receive any less protection when it also “can plausibly be interpreted as commenting on any political or social issue.” Id. at 422, 425, 127 S.Ct. 2618. One need not be a philosopher of Mill or Feinberg’s stature[18] to recognize that harmful speech posing an “immediately obvious” threat to the “physical safety of students,” id. at 425, 127 S.Ct. 2618, presents a far graver threat to the educational mission of schools—thereby warranting less protection—than ambiguously lewd speech that might undercut teaching “the appropriate form of civil discourse” to students, Fraser, 478 U.S. at 683, 106 S.Ct. 3159. It would make no sense to afford a T-shirt exclaiming “I V pot! (LEGALIZE IT)” protection under Morse while declaring that a bracelet saying “I V boobies! (KEEP A BREAST)” is unprotected under Fraser.
Those limits are persuasive on their own terms, even if we disregard the controlling limitations of Justice Alito’s Morse concurrence. Fraser reflects the longstanding notions that “not all speech is of equal First Amendment importance” and that “speech on matters of public concern ... is at the heart of the First Amendment’s protection.” Snyder v. Phelps, — U.S. —131 S.Ct. 1207, 1215, 179 L.Ed.2d 172 (2011) (quotation marks and citations omitted); see also Connick v. Myers, 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (“[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.” (internal quotation marks and citations omitted)). And it is only a limited exception to the otherwise “bedrock principle” of the First Amendment that “the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.” Texas v. Johnson, 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989); see also Sable Commc’ns of Cal. Inc. v. FCQ 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989) (“Sexual expression which is indecent but not obscene is protected by the First Amendment.”). The Supreme Court has never held that schools may bore willy-nilly through that bedrock principle. But it has made clear that “minors are entitled to a significant measure of First Amendment protection” and the government does not “have a free-floating power to restrict the ideas to which children may be exposed.” Brown v. Entm’t Merchs. Ass’n, — U.S. -, 131 S.Ct. 2729, 2736, 180 L.Ed.2d 708 (2011). To be sure, Fraser rejected the idea that “simply because an offensive form of expression may not be prohibited to adults making what the speaker considers a political point, the same latitude must be permitted to children in a public school.” Fraser, 478 U.S. at 682, 106 S.Ct. 3159. As we have explained, though, Fraser was limited to plainly lewd speech, and *315 that refusal to protect a student’s plainly lewd speech where the same speech by an adult would be protected does not extend to political speech that is not plainly lewd. On that score, our conclusion puts us in good company with five justices in Morse[19] who were expressly unwilling to permit a categorical exception to Tinker that would intrude on political or social speech and two justices[20] who all but said as much.
What’s more, this limitation is consistent with our previous intuitions as well as those of the Sixth and Second Circuits. See Saxe, 240 F.3d at 213 (Alito, J.) (noting that the “dichotomy” between Fraser and Tinker is “neatly illustrated by the comparison between Cohen’s [“Fuck the Draft”] jacket and Tinker’s armband”); Defoe, 625 F.3d at 335 n. 6 (rejecting the Eleventh Circuit’s extension of Fraser to displays of the Confederate flag and instead holding that such displays “by students [are] protected political speech that school officials may only regulate by satisfying the Tinker standard” (citing Barr v. Lafon, 538 F.3d 554, 569 n. 7 (6th Cir. 2008))); Guiles, 461 F.3d at 325 (holding Fraser inapplicable because the T-shirt was not “as plainly offensive as the sexually charged speech considered in Fraser ... [,] especially when considering that [it was] part of an anti-drug political message”).
Consequently, we hold that the Fraser exception does not permit ambiguously lewd speech to be categorically restricted if it can plausibly be interpreted as political or social speech.
3. Under Fraser, schools may restrict plainly lewd speech regardless of whether it could plausibly be interpreted as social or political commentary.
As the Supreme Court made clear in Fraser, though, schools may restrict plainly lewd speech regardless of whether it could plausibly be interpreted to comment on a political or social issue. Fraser, 478 U.S. at 682, 106 S.Ct. 3159 (“[T]he First Amendment gives a high school student the classroom right to wear Tinker’s armband, but not Cohen’s [“Fuck the Draft”] jacket.”). That is true by defini *316 tion. Plainly lewd speech “offends for the same reasons obscenity offends” because the speech in that category is “no essential part of any exposition of ideas” and thus carries very “slight social value.” Id. at 683, 106 S.Ct. 3159 (quoting Pacifica Found., 438 U.S. at 746, 98 S.Ct. 3026 (plurality opinion)). As with obscenity in general, obscenity to minors, and all other historically unprotected categories of speech, “the evil to be restricted so overwhelmingly outweighs the expressive interests, if any, at stake, that no process of case-by-case adjudication is required” because “the balance of competing interests is clearly struck.” Stevens, 130 S.Ct. at 1585-86 (quoting New York v. Ferber, 458 U.S. 747, 763-64, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982)). In other words, we do not engage in a case-by-case determination of whether obscenity to minors—and by extension, plainly lewd speech under Fraser—carries social value. As a result, schools may continue to regulate plainly lewd, vulgar, profane, or offensive speech under Fraser even if a particular instance of such speech can “plausibly be interpreted as commenting on any political or social issue.” Morse, 551 U.S. at 422, 127 S.Ct. 2618 (Alito, J., concurring).
In response, the School District recites a mantra that has Fraser providing schools the ultimate discretion to define what is lewd and vulgar. It relies on the Supreme Court’s sentiment that schools may define their “basic educational mission” and prohibit student speech that is inconsistent with that mission. Kuhlmeier, 484 U.S. at 266-67, 108 S.Ct. 562.[21] Indeed, before Morse, some courts of appeals adopted that broad interpretation of the Supreme Court’s student-speech cases. See, e.g., LaVine v. Blaine Sch. Dist., 257 F.3d 981, 988 (9th Cir.2001) (“[A] school need not tolerate student speech that is inconsistent with its basic educational mission.”); Boroff v. Van Wert City Bd. of Educ., 220 F.3d 465, 470 (6th Cir.2000) (“[Wjhere Boroffs T-shirts contain symbols and words that promote values that are so patently contrary to the school’s educational mission, the School has the authority, under the circumstances of this case, to prohibit those T-shirts [under Fraser ].”).
Whatever the face value of those sentiments, such sweeping and total deference to school officials is incompatible with the Supreme Court’s teachings. In Tinker, Hazelwood, and Morse, the Supreme Court independently evaluated the meaning of the student’s speech and the reasonableness of the school’s interpretation and actions. There is no reason the school’s authority under Fraser should receive special treatment. More importantly, such an approach would swallow the other student-speech cases, including Tinker, effectively eliminating judicial review of student-speech restrictions. See Guiles, 461 F.3d at 327 (making this point). That is precisely why the Supreme Court in Morse explicitly rejected total deference to school officials:
*317 The opinion of the Court does not endorse the broad argument advanced by petitioners and the United States that the First Amendment permits public school officials to censor any student speech that interferes with a school’s “educational mission.” ... The “educational mission” argument would give public school authorities a license to suppress speech on political and social issues based on disagreement with the viewpoint expressed. The argument, therefore, strikes at the very heart of the First Amendment.
Morse, 551 U.S. at 423, 127 S.Ct. 2618 (Alito, J., concurring).
Instead, Morse settled on a narrower view of deference, deferring to a school administrator’s “reasonable judgment that Frederick’s sign qualified as drug advocacy” only if the speech could not plausibly be interpreted as commenting on a political or social issue. Morse, 551 U.S. at 441, 127 S.Ct. 2618 (Stevens, J., dissenting); see also id. at 408, 127 S.Ct. 2618 (majority opinion) (“[Sjchools [may] restrict student expression that they reasonably regard as promoting illegal drug use.”); id. at 422, 127 S.Ct. 2618 (Alito, J., concurring) (“[A] public school may restrict speech that a reasonable observer would interpret as advocating illegal drug use.... ”). Our approach to lewd speech provides the same degree of deference to schools as the Court did in Morse. We defer to a school’s reasonable judgment that an observer could interpret ambiguous speech as lewd, vulgar, profane, or offensive only if the speech could not plausibly be interpreted as commenting on a political or social issue.
The School District invokes a parade of horribles that, in its view, would follow from our framework: protecting ambiguously lewd speech that comments on political or social issues—like the bracelets in this case—will encourage students to engage in more egregiously sexualized advocacy campaigns, which the schools will be obliged to allow. See Pa. Sch. Bd. Ass’n Amicus Br. in Supp. of Appellant at 19 (listing examples, including “I V Balls!” apparel for testicular cancer, and “I ¥ Va Jay Jays” apparel for the Human Papillomaviruses); App. 275-76 (raising the possibility of apparel bearing the slogans “I ¥ Balls!” or “I ¥ Titties!”). Like all slippery-slope arguments, the School District’s point can be inverted with equal logical force. If schools can categorically regulate terms like “boobies” even when the message comments on a social or political issue, schools could eliminate all student speech touching on sex or merely having the potential to offend. See Frederick Schauer, Slippery Slopes, 99 Harv. L.Rev. 361, 381 (1985) (“[I]n virtually every case in which a slippery slope argument is made, the opposing party could with equal formal and linguistic logic also make a slippery slope claim.”). The ease of turning a slippery-slope argument on its head explains why the persuasiveness of such a contention does not depend on its logical validity. Id. Instead, the correctness of a slippery-slope argument depends on an empirical prediction that a proposed rule will increase the likelihood of some other undesired outcome occurring. Id. (“To some people, one argument will seem more persuasive than the other because the underlying empirical reality ... makes one equally logical possibility seem substantially more likely to occur than the other.”); see also Eugene Volokh, The Mechanism, of the Slippery Slope, 116 Harv. L.Rev. 1026, 1066-71 (2003) (making a similar point in the context of extending precedent). Because courts usually lack the data necessary for such a prediction, “fear of ... what’s at the bottom of a long, slippery slope is not a good reason for *318 today’s decision.” Marozsan v. United States, 852 F.2d 1469, 1499 (7th Cir.1988) (en banc) (Easterbrook, J., dissenting). “The terror of extreme hypothetieals produces much bad law,” and so our answer to the School District’s “extreme hypothetical[s]” is that we will “cross that bridge when we come to it.” Id.
To make matters worse, the School District has greased the supposedly slippery slope by omitting any empirical evidence. We have no reason to think either that the parents of middle-school students will be willing to allow their children to wear apparel advocating political or social messages in egregious terms or that a student will overcome the typical middle-schooler’s embarrassment, immaturity, and social pressures by wearing such apparel. And many of the School District’s hypothetieals pose no worries under our framework. A school could categorically restrict an “I V tits! (KEEP A BREAST)” bracelet.because, as the Supreme Court explained in Pacifica, the word “tits” (and also presumably the diminutive “titties”) is a patently offensive reference to sexual organs and thus obscene to minors. See Pacifica Found., 438 U.S. at 745-46, 98 S.Ct. 3026 (plurality opinion) (explaining that the comedian George Carlin’s seven “dirty” words, which includes “tits,” “offend for the same reasons that obscenity offends”); see also LaVine, 257 F.3d at 989 (concluding that a poem “filled with imagery of violent death and suicide” was not “vulgar, lewd, obscene, or plainly offensive because it was “not ‘an elaborate, graphic, and explicit sexual metaphor’ ” as was the student’s speech in Fraser, nor [did] it contain the infamous seven words that cannot be said on the public airwaves”); cf. FCC v. Fox Television Stations, Inc., 556 U.S. 502, 517-18, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009) (concluding it was not arbitrary or capricious for the FCC to regulate even “isolated uses of sexual and excretory words,” including Carlin’s seven “dirty” words, because “[e]ven isolated utterances can be made in pander[ing], ... vulgar and shocking manners” and can thus “constitute harmful first blow[s] to children” (alterations in original)). The same is true of a student’s drawings of stick figures in sexual positions, even if used to promote contraceptive use. Cf. R.O. ex rel. Ochshorn City Sch. Dist. v. Ithaca City School Dist., 645 F.3d 533, 543 (2d Cir.2011). And even if students engage in more questionable speech, the school retains the government’s normal sovereign authority to regulate speech as well as its additional powers as educator to restrict speech under Tinker, Kuhlmeier, and Morse. See, e.g., Hardwick v. Heyward, 711 F.3d 426, 440 (4th Cir.2013) (holding that a school’s prohibition on wearing T-shirts depicting the Confederate battle flag was permissible under Tinker because of a history of racial tension and disruptions related to the Confederate flag).
By contrast, there is empirical support for the opposite worry. Some schools, if empowered to do so, might eliminate all student speech touching on sex or merely having the potential to offend. Indeed, the Middle School’s administrators seemed inclined to do just that. They initially testified that they could ban the word “breast,” even if used in the context of a breast-cancer-awareness campaign, because the word, by itself, “can be construed as [having] a sexual connotation.” App. 490, 497. If anything, the fear of a slippery slope cuts against the School District.
In a similar vein, we need not speculate on context-dependent hypothetieals to give guidance to schools and district courts. The fault lines of our framework are adequately mapped out in the rest of First Amendment jurisprudence. The Supreme Court’s obscenity- *319 to-minors case law marks the contours of plainly lewd speech. See, e.g., Brown v. Entm’t Merchs. Ass’n, — U.S.-, 131 S.Ct. 2729, 2735, 180 L.Ed.2d 708 (refusing to extend the categorical nonprotection for obscenity to minors to speech that is violent from a minor’s perspective); Ginsberg, 390 U.S. at 638, 88 S.Ct. 1274 (approving a state prohibition on selling minors sexual material that would be obscene from the minor’s perspective). Those contours necessarily admit of some flexibility and can be “adjusted] ... ‘to social realities by permitting the [sexual] appeal of this type of material to be assessed’ ” from the minors’ perspective. Id.; see also Fox Television Stations, Inc., 556 U.S. at 520, 129 S.Ct. 1800 (explaining that based on the obscenity-to-minors case law, the FCC properly “dr[aws] distinctions between the offensiveness of particular words based upon the context in which they appeared” on ease-by-case basis without having to rely on empirical evidence as to the degree of offensiveness). And the government is not a stranger to determining whether speech plausibly comments on a political or social issue. For that, we look to case law on whether speech involves a matter of public concern. See, e.g., Garcetti v. Ceballos, 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006) (“Pickering and the cases decided in its wake identify two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern---- If the answer is yes, then the possibility of a First Amendment claim arises.”). Of course, these rules lack “perfect clarity”—-just as every legal rule contains fuzzy borders. Brown, 131 S.Ct. at 2764 (Breyer, J., dissenting); cf. United States v. Williams, 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008) (“[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.”). Even so, just because a “precise standard” for political speech or plain lewdness (obscenity to minors) “proves elusive,” it is still “easy enough to identify instances that fall within a legitimate regulation.” Broivn, 131 S.Ct. at 2764 (Breyer, J., dissenting). Over time, the fault lines demarcating plainly lewd speech and political or social speech will settle and become more rule-like as precedent accumulates.
To recap: Under the government’s sovereign authority, a school may categorically ban obscenity, fighting words, and the like in schools; the student-speech cases do not supplant the government’s sovereign powers to regulate speech. See, e.g., Doe v. Pulaski Cnty. Special Sch. Dist., 306 F.3d 616, 626, 626-27 (8th Cir.2002) (en banc) (holding that the government, as K-12 educator, could punish a student for making a true threat); Cuff ex rel. B.C. v. Valley Cent. Sch. Dist., 677 F.3d 109, 118 (2d Cir.2012) (Pooler, J., dissenting) (“Indeed, despite the expansion of school-specific exceptions to the First Amendment’s general prohibition against government restrictions on speech, certain well-settled rules apply to adults and adolescents alike.”). Under Fraser, a school may categorically restrict plainly lewd, vulgar, or profane speech that “offends for the same reasons obscenity offends” regardless of whether it can plausibly be interpreted as commenting on social or political issues. Saxe, 240 F.3d at 213 (quoting Fraser, 478 U.S. at 685, 106 S.Ct. 3159). As we have explained, see supra at 304, plainly lewd speech cannot, by definition, be plausibly interpreted as political or social commentary because the speech offends for the same reason obscenity offends and thus has slight social value. Fraser also per *320 mits a school to categorically restrict ambiguous speech that a reasonable observer could interpret as having a lewd, vulgar, or profane meaning so long as it could not also plausibly be interpreted as commenting on a social or political issue. But Fraser does not permit a school to categorically restrict ambiguous speech that a reasonable observer could interpret as having a lewd, vulgar, or profane meaning and could plausibly interpret as commenting on a social or political issue. And of course, if a reasonable observer could not interpret the speech as lewd, vulgar, or profane, then Fraser simply does not apply. As always, a school’s other powers over student speech under Tinker, Kuhlmeier, and Morse remain as a backstop.
C. The Middle School’s ban on “I ¥ boobies! (KEEP A BREAST) ” bracelets
Under this framework, the School District’s bracelet ban is an open-and-shut case. The “I ¥ boobies! (KEEP A BREAST)” bracelets are not plainly lewd. The slogan bears no resemblance to Fraser’s “pervasive sexual innuendo” that was “plainly offensive to both teachers and students.” Fraser, 478 U.S. at 683, 106 S.Ct. 3159. Teachers had to request guidance about how to deal with the bracelets, and school administrators did not conclude that the bracelets were vulgar until B.H. and K.M. had worn them every day for nearly two months. In addition, the Middle School used the term “boobies” in announcing the bracelet ban over the public address system and the school television station. What’s more, the bracelets do not contain language remotely akin to the seven words that are considered obscene to minors on broadcast television. Pacifica Found., 438 U.S. at 745-46, 98 S.Ct. 3026 (plurality opinion); LaVine, 257 F.3d at 989 (concluding that speech was not vulgar, lewd, obscene, or plainly offensive because it was “not ‘an elaborate, graphic, and explicit sexual metaphor’ as was the student’s speech in Fraser, nor [did] it contain the infamous seven words that cannot be said on the public airwaves” under Pacifica). Indeed, the term “boobie” is no more than a sophomoric synonym for “breast.” And as the School District also concedes, a reasonable observer would plausibly interpret the bracelets as part of a national breast-cancer-awareness campaign, an undeniably important social issue. Oral Arg. Tr. at 10:1116; see also K.J. ex rel. Braun v. Sauk Prairie Sch. Dist., No. 11-CV-622, slip op. at 14 (W.D.Wis. Feb. 6, 2012) (“When one reads the entire phrase, it is clearly a message designed to promote breast cancer awareness.”). Accordingly, the bracelets cannot be categorically banned under Fraser.[22]
IV.
Fraser, of course, is only one of four school-specific avenues for regulating student speech.[23] The parties rightly agree *321 that Kuhlmeier and Morse do not apply: no one could reasonably believe that the Middle School was somehow involved in the morning fashion decisions of a few students, and no one could reasonably interpret the bracelets as advocating illegal drug use.
That leaves only Tinker as possible support for the School District’s ban. Under Tinker’s “general rule,” the government may restrict school speech “that threatens a specific and substantial disruption to the school environment” or “inva[des] ... the rights of others.” Saxe, 240 F.3d at 211 (citing Tinker, 393 U.S. at 504, 89 S.Ct. 733). “[I]f a school can point to a well-founded expectation of disruption—especially one based on past incidents arising out of similar speech—the restriction may pass constitutional muster.” Id. at 212; J.S. v. Blue Mountain Sch. Dist., 650 F.3d 915, 928 (3d Cir.2011) (en banc) (“[T]he School District need not prove with absolute certainty that substantial disruption will occur.”). The School District has the burden of showing that the bracelet ban is constitutional under Tinker. See J.S., 650 F.3d at 928. That it cannot do.
Tinker meant what it said: “a specific and significant fear of disruption, not just some remote apprehension of disturbance.” Id. Tinker’s black armbands did not meet this standard, even though the armbands “caused comments, warnings by other students, the poking of fun at them, ... a warning by an older football player that other, nonprotesting students had better let them alone,” and the “wrecking]” of a math teacher’s lesson period. Tinker, 393 U.S. at 517, 89 S.Ct. 733 (Black, J„ dissenting).
Here, the record of disruption is even skimpier. When the School District announced the bracelet ban, it had no more than an “undifferentiated fear or remote apprehension of disturbance.” Sypniewski 307 F.3d at 257. The bracelets had been on campus for at least two weeks without incident. B.H., 827 F.Supp.2d at 408; see also App. 13 (“[N]one of the three principals had heard any reports of disruption or student misbehavior linked to the bracelets. Nor had any of the principals heard reports of inappropriate comments about ‘boobies.’ ”). That track record “speaks strongly against a finding of likelihood of disruption.” Sypniewski, 307 F.3d at 254.
The School District instead relies on two incidents that occurred after the ban. In one, a female student told a teacher that she believed some boys had remarked to girls about their “boobies” in relation to the bracelets—an incident that was never confirmed. B.H., 827 F.Supp.2d at 408. In the other, two female students were discussing the bracelets during lunch, and a boy interrupted them to say “I want boobies” while “making inappropriate gestures with two spherical candies.” Id. The boy was suspended for a day. Id.
Even assuming that disruption arising after a school’s speech restriction could satisfy Tinker—a question we need not decide today—these two isolated incidents hardly bespeak a substantial disruption caused by the bracelets. “[S]tudent expression may not be suppressed simply because it gives rise to some slight, easily overlooked disruption, including but not *322 limited to ‘a showing of mild curiosity’ by other students, ‘discussion and comment’ among students, or even some ‘hostile remarks’ or ‘discussion outside of the classrooms’ by other students.” Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1271-72 (11th Cir.2004) (internal quotation marks and citations omitted). Given that Tinker’s black armband—worn to protest a controversial war and divisive enough to prompt reactions from other students— was not a substantial disruption, neither is the “silent, passive expression” of breast-cancer awareness.[24] Tinker, 393 U.S. at 508, 89 S.Ct. 733. If anything, the fact that these incidents did not occur until after the School District banned the bracelets suggests that the ban “exacerbated rather than contained the disruption in the school.” J.S., 650 F.3d at 931 (drawing this same conclusion on a similar record).
Undeterred, the School District invokes the other half of Tinker’s general rule, arguing that the bracelets invade other students’ Title IX rights to be free from sexual harassment. See Tinker, 393 U.S. at 513, 89 S.Ct. 733. Under Title IX, students may sue federally-funded schools that “act[ ] with deliberate indifference” to “harassment that is so severe, pervasive, and objectively offensive ... that the victim students are effectively denied equal access to an institution’s resources and opportunities.” Saxe, 240 F.3d at 205-06 (quoting Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 651, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999)). According to the School District, the “I V boobies! (KEEP A BREAST)” bracelet was “deemed inappropriate for school due to the likelihood of a resultant increase in student-on-student sexual harassment.” Sch. Dish’s Br. at 54.
That argument suffers from several flaws, not the least of which is the School District’s failure to raise it in the District Court and that Court’s consequent failure to address it. Freeman v. Pittsburgh Glass Works, LLC, 709 F.3d 240, 249 (3d Cir.2013) (“We generally refuse to consider issues that the parties have not raised below.” (citing Singleton v. Wulff, 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976))). But there is an even more basic reason why the School District’s invocation of Title IX Is not the shield it claims to be. Even assuming that protecting students from harassment under Title IX would satisfy Tinker’s rights- *323 of-others prong,[25] the School District does not explain why the bracelets would breed an environment of pervasive and severe harassment. See, e.g., DeJohn v. Temple Univ., 537 F.3d 301, 320 (3d Cir.2008) (“[U]nless harassment is qualified with a standard akin to a severe or pervasive requirement, [an anti-]harassment policy may suppress core protected speech.”); Saxe, 240 F.3d at 217 (rejecting a school district’s similar argument that it could ban speech creating a “hostile environment” without showing that the particular speech covered by the policy would create a severe or pervasive environment); see also Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. No. 204, 523 F.3d 668, 676 (7th Cir.2008) (“[I]t is highly speculative that allowing the plaintiff to wear a T-shirt that says “Be Happy, Not Gay” would have even a slight tendency to provoke such incidents [of student-on-student harassment], or for that matter to poison the educational atmosphere.”).
The bracelet ban cannot be upheld on the authority of Tinker.
V.
Because the School District’s ban cannot pass scrutiny under Fraser or Tinker, B.H. and K.M. are likely to succeed on the merits. In light of that conclusion, the remaining preliminary-injunction factors also favor them. The ban prevents B.H. and K.M. from exercising their right to freedom of speech, which “unquestionably constitutes irreparable injury.” K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist., 710 F.3d 99, 113 (3d Cir.2013) (quoting Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion)). An after-the-fact money judgment would hardly make up for their lost opportunity to wear the bracelets in school. See Elrod, 427 U.S. at 374 n. 29, 96 S.Ct. 2673 (“The timeliness of political speech is particularly important.”).
And the preliminary injunction does not “result in even greater harm to” the School District, the non-moving party. Allegheny Energy, Inc. v. DQE, Inc., 171 F.3d 153, 158 (3d Cir.1999). The School District complains that unless the bracelet ban stands, it “has no clear guidance” on how to enforce its dress code. Appellant’s Br. at 60. But the injunction addresses only the School District’s ban of the “I V boobies! (KEEP A BREAST)” bracelets. It does not enjoin the School District’s regulation of other types of apparel, such as the “Save the ta-tas” T-shirt or testicular-cancer-awareness apparel bearing the phrase “feelmyballs.org.” Whether the injunction stays or goes, the School District will have to continue making individualized assessments of whether it may restrict student speech consistent with the First Amendment, just as school administrators *324 have always had to do. See, e.g., Castorina ex rel. Rewt v. Madison Cnty. Sch. Bd., 246 F.3d 536, 543 (6th Cir.2001) (“The foregoing discussion of the three Supreme Court ... cases demonstrates the importance of the factual circumstances in school speech cases.... ”). The District Court’s injunction against the bracelet ban does not change that.
Lastly, granting the preliminary injunction furthers the public interest. The School District argues that the injunction eliminates its “authority to manage its student population” and thus harms the public. Appellant’s Br. at 61. Again, that hyperbolic protest ignores the narrow breadth of the injunction, which addresses only the constitutionality of the bracelet ban under the facts of this case. More importantly, allowing a school’s unconstitutional speech restriction to continue “vindicates no public interest.” K.A., 710 F.3d at 114 (citation omitted). For these reasons, the District Court did not abuse its discretion by enjoining the School District’s bracelet ban.
* sfc % # ‡ #
School administrators “have a difficult job,” and we are well-aware that the job is not getting any easier. Morse, 551 U.S. at 409, 127 S.Ct. 2618. Besides the teaching function, school administrators must deal with students distracted by cell phones in class and poverty at home, parental under- and over-involvement, bullying and sex-ting, preparing students for standardized testing, and ever-diminishing funding. When they are not focused on those issues, school administrators must inculcate students with “the shared values of a civilized social order.” Fraser, 478 U.S. at 683, 106 S.Ct. 3159; see also McCauley v. Univ. of the V.I., 618 F.3d 232, 243 (3d Cir.2010) (quoting Brown v. Bd. of Educ., 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954)) (“Public elementary and high school education is as much about learning how to be a good citizen as it is about multiplication tables and United States history.”).
We do not envy those challenges, which require school administrators “to make numerous difficult decisions about when to place restrictions on speech in our public schools.” Morgan v. Swanson, 659 F.3d 359, 420 (5th Cir.2011) (en banc) (majority opinion of Elrod, J.). And the School District in this case was not unreasonably concerned that permitting “I V boobies! (KEEP A BREAST)” bracelets in this case might require it to permit other messages that were sexually oriented in nature. But schools cannot avoid teaching our citizens-in-training how to appropriately navigate the “marketplace of ideas.” Just because letting in one idea might invite even more difficult judgment calls about other ideas cannot justify suppressing speech of genuine social value. Tinker, 393 U.S. at 511, 89 S.Ct. 733 (“The classroom is peculiarly the ‘marketplace of ideas.’ The Nation’s future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth ‘out of a multitude of tongues,’ (rather) than through any kind of authoritative selection.’ ” (quoting Keyishian v. Bd. of Regents of Univ. of State of N.Y., 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967))); see id. at 511, 89 S.Ct. 733 (“[S]ehool officials cannot suppress ‘expressions of feelings with which they do not wish to contend.’ ” (citation omitted)).
We will affirm the District Court’s order granting a preliminary injunction.

. In mid-October before the ban was publicly announced, school administrators received some unrelated reports of inappropriate touching, but neither the word "boobies” nor the bracelets were considered a cause of these incidents.

. The Middle School permits students to wear the Foundation’s "check yVurself (KEEP A BREAST)” bracelets.

.After the district-wide ban was in place, there were several incidents of middle-school boys inappropriately touching girls, but they were unrelated to the “I V boobies! (KEEP A BREAST)” bracelets.

. B.H. and K.M. do not assert a facial challenge to the constitutionality of the dress-code policy.

. The District Court had both federal-question jurisdiction under 28 U.S.C. § 1331 and § 1983 jurisdiction under 28 U.S.C. § 1343(a)(3). See Max v. Republican Comm. *301 of Lancaster Cnty., 587 F.3d 198, 199 n. 1 (3d Cir.2009).

. Even the Middle School administrators seemed unsure which words would be prohibited by the dress code. When deposed, Viglianti and principal Angela DiVietro testified that the word "breast” (as in apparel stating "keep-a-breast.org” or "breast cancer awareness”) would be inappropriate because the word "breast” "can be construed as [having] a sexual connotation.” App. 490, 497. At the District Court’s evidentiary hearing, they reversed course. Viglianti stated that "keep-abreast.org” would be appropriate "[i]n the context of Breast Cancer Awareness Month,” and DiVietro no longer believed the phrase “breast cancer awareness” was vulgar to middle-school students.

. The rest of the Supreme Court’s student-speech jurisprudence might fairly be described as opaque. See Morse, 551 U.S. at 418, 127 S.Ct. 2618 (Thomas, J., concurring) ("I am afraid that our jurisprudence now says that students have a right to speak in schools except when they do not____”); id. at 430, 127 S.Ct. 2618 (Breyer, J., concurring in part and dissenting in part) ("[Cjourts have described the tests these cases suggest as complex and often difficult to apply.”); see, e.g, Doninger v. Niehoff, 642 F.3d 334, 353 (2d Cir.2011) (“The law governing restrictions on student speech can be difficult and confusing, even for lawyers, law professors, and judges. The relevant Supreme Court cases can be hard to reconcile, and courts often struggle with which standard applies in any particular case.”); Guiles ex rel. Guiles v. Marineau, 461 F.3d 320, 326, 331 (2d Cir.2006) (acknowledging "some lack of clarity in the Supreme Court's student-speech cases” and stating that the "exact contours of what is plainly offensive [under Fraser ] is not so clear”).

. Other examples of categorically unprotected speech include child pornography, see New York v. Ferber, 458 U.S. 747, 764-65, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), advocacy that imminently incites lawless action, see Brandenburg v. Ohio, 395 U.S. 444, 447-48, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (per curiam), fighting words, see Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), true threats, see Watts v. United States, 394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (per curiam), commercial speech that is false, misleading, or proposes illegal transactions, see Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557, 562, 566-67, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), and some false statements of fact, see United States v. Alvarez, - U.S. -•, 132 S.Ct. 2537, 2546-47, 183 L.Ed.2d 574 (2012).

. We have not yet decided whether Tinker is limited to on-campus speech. See J.S. v. Blue Mountain Sch. Dist., 650 F.3d 915, 926 & n. 3 (3d Cir.2011) (en banc) (declining to reach this issue); see also id. at 936 (Smith, J., concurring) ("I write separately to address a question that the majority opinion expressly leaves open; whether Tinker applies to off-campus speech in the first place.”).

. As we explain in Part III.B(2), the limitations that Justice Alito's concurrence places on the majority's opinion in Morse are controlling.

. Compare Pleasant Grove City, Utah v. Sum-mum, 555 U.S. 460, 468, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009) (discussing the government-speech doctrine and explaining that ''[a] government entity may exercise this same freedom to express its views when it receives assistance from private sources for the purpose of delivering a government-controlled message" (citing Johanns, 544 U.S. at 562, 125 S.Ct. 2055)), with Kuhlmeier, 484 U.S. at 271, 273, 108 S.Ct. 562 (reaffirming the government's same authority to control speech that might be “reasonably perceive[d] to bear the imprimatur of the school” in its role as K-12 educator); see also Eugene Volokh, The First Amendment and the Government as K-12 Educator, The Volokh Conspiracy (Oct. 31, 2011, 6:26 PM), http://www.volokh.com/2011/ 10/31/the-first-amendment-and-the-government-as-k-12-educator/ ("[Kuhlmeier ] generally reflects broad government-as-speaker law, and not special rules related to the government as K-12 educator.”); Michael J. O’Connor, Comment, School Speech in the Internet Age: Do Students Shed Their Rights When They Pick Up a Mouse?, 11 U. Pa. J. Const. L. 459, 469 (2009) ("Hazelwood ... simply illustrates the idea that the school speech arena is not isolated from developments in wider First Amendment jurisprudence .... Hazelwood recognizes that schools are government actors and therefore are entitled to control speech that could be reasonably viewed as originating with them.”); Gia B. Lee, First Amendment Enforcement in Government Institutions and Programs, 56 UCLA L.Rev. 1691, 1711-12 (2009) (similar).

. See Brown v. Entm’t Merchs. Ass’n, - U.S.-, 131 S.Ct. 2729, 2735, 180 L.Ed.2d 708 (2011) (describing Ginsberg as regulating "obscenity for minors”); Reno v. ACLU, 521 U.S. 844, 869, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (reaffirming the government's power under Pacifica and Ginsberg to " 'protect ] the physical and psychological well-being of minors' which extended to shield them from indecent messages that are not obscene by adult standards” (quoting Sable Comm’cns of Cal., Inc. v. FCC, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989))); Pacifica Found.., 438 U.S. at 767, 98 S.Ct. 3026 (Brennan, J., dissenting) (agreeing with the majority that the government could regulate “variable obscenity” or "obscenity to minors” on broadcast television, but disagreeing with the majority that the Carlin monologue met that standard); Erznoznik v. City of Jacksonville, 422 U.S. 205, 213 n. 10, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975) (describing Ginsberg as involving "obscenity as to minors”); Ginsberg, 390 U.S. at 635 n. 4, 88 S.Ct. 1274 (using the label "variable obscenity”).

. Of course, Fraser’s speech might ”seem[] distinctly lacking in shock value” today, especially "from the perspective enabled by 25 years of erosion of refinement in the use of language.” Zamecnik v. Indian Prairie Sch. Dist. No. 204, 636 F.3d 874, 877 (7th Cir.2011); see also Fraser, 478 U.S. at 691, 106 S.Ct. 3159 (Stevens, J., dissenting) (noting that Clark Gable’s famous use of the word "damn” in "Frankly, my dear, I don’t give a damn” "shocked the Nation” when Justice Stevens was a high school student but had become "less offensive” by the time of Fraser). Any such change in perspective, however, is irrelevant to our examination of the Court's interpretation of Fraser’s speech and its reasoning.

. Fraser differs from this case in a third way: Fraser involved speech at an official school assembly, whereas the School District's bracelet ban extends to the entire school day, not just school-sponsored functions. But like other courts of appeals, we do not think that this difference matters. See, e.g., R.O. ex rel. Ochshorn v. Ithaca City Sch. Dist., 645 F.3d 533, 542 (2d Cir.2011) ("[W]e have not interpreted Fraser as limited either to regulation of school-sponsored speech or to the spoken word.”); Chandler, 978 F.2d at 529 (concluding that restriction of vulgar, lewd, and plainly offensive speech under Fraser is not limited to speech "given at an official school assembly”); Bystrom by and through Bystrom v. Fridley High Sch., Indep. Sch. Dist. No. 14, 822 F.2d 747, 753 (8th Cir. 1987) ("It is true that {Fraser ] involved a speech given before a student assembly.... [But] [t]his possible difference, in our view, does not amount to a legal distinction making the Bethel rule inapplicable here.”). As we explained, Fraser reflected an extension of the Court’s obscenity-to-minors jurisprudence, which permits the government to restrict lewd speech to children where children are either a captive audience or the intended recipients of the speech. Children are just as much of a captive audience in the hallways, cafeteria, or locker rooms as they are in official school assemblies and classrooms. Naturally, then, we have never described a school’s authority under Fraser as being limited to official school functions and classrooms. See, e.g., J.S., 650 F.3d at 927 ("The first exception is set out in Fraser, which we interpreted to permit school officials to regulate 'lewd,' ‘vulgar,’ ‘indecent,’ and 'plainly offensive’ speech in school.” (emphasis in original) (quoting Saxe, 240 F.3d at 213)). Although Justice Brennan’s concurrence and Justice Stevens’s dissent in Fraser suggested that this difference might matter, nothing in the majority opinion endorsed their distinction. See Fraser, 478 U.S. at 689, 106 S.Ct. 3159 (Brennan, J., concurring) (opining that Fraser's “speech may well have been protected had he given it in school but under different circumstances, where the school’s legitimate interests in teaching and maintaining civil public discourse were less weighty”); id. at 696, 106 S.Ct. 3159 (Stevens, J., dissenting) ("It seems fairly obvious that [Fraser’s] speech would be inappropriate *308 in certain classroom and formal social settings. On the other hand, in a locker room or perhaps in a school corridor the metaphor in the speech might be regarded as rather routine comment.”). Indeed, if Fraser were so limited, then a school's authority under Fraser would largely merge with its power to reasonably regulate school-sponsored speech under Kuhlmeier, yet we have always viewed Fraser and Kuhlmeier as separate exceptions to Tinker. See, e.g., J.S., 650 F.3d at 927.

. See discussion of Horn and Bishop infra pp. 311-13.

, See, e.g., Nichols v. United States, 511 U.S. 738, 746, 114 S.Ct. 1921, 128 L.Ed.2d 745 (1994) (combining the views of four dissenters and Justice Stewart in Baldosar v. Illinois, 446 U.S. 222, 100 S.Ct. 1585, 64 L.Ed.2d 169 (1980), to form a "holding"); Donovan, 661 F.3d at 182 ("[W]e have looked to the votes of dissenting Justices if they, combined with votes from plurality or concurring opinions, establish a majority view on the relevant issue.”); Student Pub. Interest Research Grp. of N.I., Inc. v. AT & T Bell Labs., 842 F.2d 1436, 1451 & n. 16 (3d Cir.1988) (same).

. We have had this same intuition previously. See J.S., 650 F.3d at 927 (“Notably, Justice Alito's concurrence in Morse further emphasizes the narrowness of the Court's holding.”). And every court of appeals to address this question (other than the Seventh Circuit) has shared our intuition. See Morgan, 589 F.3d at 746 n. 25; Barr v. Lafon, 538 F.3d 554, 564 (6th Cir.2008) (treating Justice Alito's concurrence as the basis for Morse’s "narrow holding”); Corder v. Lewis Palmer Sch. Dist. No. 38, 566 F.3d 1219, 1228 (10th Cir.2009) (same). The Seventh Circuit concluded, without citation or support, that the narrowest-grounds approach does not apply where there is a majority opinion, as in Morse. Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. No. 204, 523 F.3d 668, 673 (7th Cir.2008). But as we explain, we have already rejected the Seventh Circuit's formalist approach when it was urged by dissenting colleagues in Horn and Bishop.

. John Stuart Mill and Joel Feinberg are both known for, among other things, their groundbreaking work on the relationship between harm and offense and how conduct of each type might be subject to criminalization. See generally Joel Feinberg, Harm to Others: The Moral Limits of the Criminal Law (1984); Joel Feinberg, Offense to Others: The Moral Limits of the Criminal Law (1985); John Stuart Mill, On Liberty (1859).

. In addition to Justices Alito and Kennedy, three dissenting justices (Justices Stevens, Souter, and Ginsburg) would not have extended the Morse exception to political or social speech. These five justices instead split over whether Morse’s speech could reasonably be interpreted as advocating illegal drug use. Morse, 551 U.S. at 444, 448, 127 S.Ct. 2618 (Stevens, J., dissenting) (concluding that Morse's banner is constitutionally protected because it could not reasonably be interpreted as advocating illegal drug use and was at most a ''minority[] viewpoint” in "the national debate about a serious issue” deserving First Amendment protection).

. In the majority opinion, Chief Justice Roberts and Justice Scalia refused to “stretch[] Fraser" so far as to "encompass any speech that could fit under some definition of 'offensive' ” specifically to protect "political and religious speech [that] might be perceived as offensive to some.” Morse, 551 U.S. at 409, 127 S.Ct. 2618; see also id. at 403, 127 S.Ct. 2618 (majority opinion) ("But not even Frederick argues that the banner conveys any sort of political or religious message. Contrary to the dissent’s suggestion, this is plainly not a case about political debate over the criminalization of drug use or possession.”); id. at 406 n. 2, 127 S.Ct. 2618 ("[T]here is no serious argument that Frederick’s banner is political speech....”). Although Justice Thomas joined that portion of the majority opinion, he would have concluded that “the First Amendment, as originally understood, does not protect student speech in public schools” and overruled Tinker. Id. at 410-11, 127 S.Ct. 2618 (Thomas, J., concurring). Justice Breyer would have avoided the "difficult First Amendment issue” and concluded that "qualified immunity bars [Morse's] claim for monetary damages.” Id. at 425, 127 S.Ct. 2618 (Breyer, J., concurring in the judgment in part and dissenting in part).

. See also Fraser, 478 U.S. at 683, 106 S.Ct. 3159 (‘‘[T]he determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board.”); Pico, 457 U.S. at 864, 102 S.Ct. 2799 ("[FJederal courts should not ordinarily ‘intervene in the resolution of conflicts which arise in the daily operation of school systems.’ ” (quoting Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968))); Woodv. Strickland, 420 U.S. 308, 326, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) ("It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion.”); see also Kuhlmeier, 484 U.S. at 273, 108 S.Ct. 562 (“[T]he education of the Nation’s youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges.”).

. Because we conclude that the slogan is not plainly lewd and is plausibly interpreted as commenting on a social issue, the bracelets are protected under Fraser. As a result, we need not determine whether a reasonable observer could interpret the bracelets’ slogan as lewd.

. As the Supreme Court has recently reaffirmed, there might be other exceptions to Tinker that have not yet been identified by the courts. See Morse, 551 U.S. at 408-09, 127 S.Ct. 2618 (identifying a new exception to the Tinker framework for speech that is reasonably interpreted as advocating illegal drug use and that is not plausibly interpreted as commenting on any political or social issue). Compare id. at 405, 127 S.Ct. 2618 ("Fraser established that the mode of analysis set forth in Tinker is not absolute.”), and id. at 406, 127 S.Ct. 2618 ("And, like Fraser, [Kuhlmeier] confirms that the rule of Tinker is not the only basis for restricting student speech.”), with id. *321 at 423, 127 S.Ct. 2618 (Alito, J., concurring) ("I join the opinion of the Court on the understanding that the opinion does not hold that the special characteristics of the public schools necessarily justify any other speech restrictions.” (emphasis added)). Here, however, the School District relies solely on the existing school-speech framework and does not propose any new bases for restricting student speech.

. According to B.H. and K.M., Tinker’s substantial-disruption standard does not permit a school to restrict speech because of the heckler’s veto of other students’ disruptive reactions. See Appellees’ Br. at 35 (emphasis added). Because no forecast of substantial disruption would be reasonable on this record under any meaning of that term, we need not determine the precise interplay between the anti-heckler's veto principle present elsewhere in free-speech doctrine and Tinker's substantial-disruption standard in public schools. Compare Zamecnik, 636 F.3d at 879 (noting that Tinker endorsed both the heckler's veto doctrine and the substantial-disruption test and concluding that other students’ harassment of "Zamecnik because of their disapproval of her ["Be Happy, Not Gay” T-shirt] is not a permissible ground for banning it”), and Holloman, 370 F.3d at 1275-76 (interpreting Tinker as endorsing an anti-heckler’s veto principle, concluding that ”[w]hile the same constitutional standards do not always apply in public schools as on public streets, we cannot afford students less constitutional protection simply because their peers might illegally express disagreement through violence instead of reason”), with Taylor v. Roswell Indep. Sch. Dist., 713 F.3d 25, 38 (10th Cir. Apr.8, 2013) ("Plaintiffs note that most disruptions occurred only because of wrongful behavior of third parties and that no Plaintiffs participated in these activities.... This argument might be effective outside the school context, but it ignores the 'special characteristics of the school environment.' ” (quoting Tinker, 393 U.S. at 506, 89 S.Ct. 733)).

. As we have repeatedly noted, "the precise scope of Tinker’s 'interference with the rights of others' language is unclear.” Saxe, 240 F.3d at 217 (quoting Tinker, 393 U.S. at 504, 89 S.Ct. 733); DeJohn v. Temple Univ., 537 F.3d 301, 319 (3d Cir.2008). And the Supreme Court has "never squarely addressed whether harassment, when it lakes the form of pure speech, is exempt from First Amendment protection.” Saxe, 240 F.3d at 207. We need not address either of these points today. Even if Tinker permits school regulation of pure speech that would constitute "harassment” under Title IX, the School District has not offered any explanation or evidence of how passively wearing the "I V boobies! (KEEP A BREAST)” bracelets would create such a severe and pervasive environment in the Middle School. Cf. Saxe, 240 F.3d at 204 (Alito, J.) ("There is no categorical ‘harassment exception’ to the First Amendment’s free speech clause.”); Rodriguez v. Maricopa Cnty. Cmty. College Dist., 605 F.3d 703, 708 (9th Cir.2010) (agreeing with Saxe’s statement).